*152 SHIRLEY S. ABRAHAMSON, J.
¶ 43. (■dissenting). Circuit courts across the state frequently address the question presented in the instant case: "How does the Confrontation Clause apply to the panoply of crime laboratory reports and underlying technical statements written by (or otherwise made by) laboratory technicians?"[1]
¶ 44. This question lies at the intersection of the Confrontation Clause and the rules of evidence. Answering the question requires the application of the Confrontation Clause to numerous types of laboratory reports and witnesses testifying about or relying on reports they did not produce.[2]
¶ 45. "Testimonial statements of witnesses absent from trial" violate a defendant's confrontation right unless "the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." Crawford v. Washington, 541 U.S. 36, 59 (2004). Crawford substantially changed confrontation law.
f 46. Since Crawford, the United State Supreme Court has progressively defined whether out-of-court statements of different types and in different contexts are testimonial. Some might say that the United States Supreme Court cases defining testimonial are in disarray, and this disarray is reflected in opinions being rendered across the country.
¶ 47. The instant case involves an autopsy report and a toxicology report. The autopsy report was admitted in evidence. The medical examiner who produced the report testified and was subject to examination and *153 cross-examination about the autopsy report. The admission of the autopsy report in evidence does not present a confrontation issue.
¶ 48. By contrast, the toxicology report was admitted into evidence by the circuit court, which stated that the toxicology report was not being "offered to prove any element that is at issue in this particular case in terms of what substance was delivered." The toxicology report was prepared at the request of the medical examiner by an independent, out-of-state laboratory. No witness testified about the preparation of the toxicology report. The medical examiner referred to the toxicology report in her testimony about the autopsy and her opinion about the cause of death.[3]
¶ 49. On appeal, however, the parties, the certification by the court of appeals, and the majority opinion apparently are inconsistent in how they characterize the admission of the toxicology report in evidence. Although the majority opinion mentions that the circuit court did not admit the toxicology report for its truth, majority op., ¶ 15, the majority opinion is not clear in how it treats the admission of the toxicology report. Compare majority op., ¶ 15 ("[T]he toxicology report "was admissible under Wis. Stat. § 907.03 (2011-12) as a basis for expert opinion testimony . . . ."), f 19 ("Whether the admission of the toxicology report and the medical examiner's testimony based upon it violates Mattox's Sixth Amend *154 ment right to confrontation ¶ 41 ("[W]e conclude the toxicology report here is not 'testimonial' and its use at trial therefore did not infringe upon Mattox's confrontation right.").
¶ 50. What is clear in the majority opinion is that it adopts a primary purpose test for determining whether the toxicology report, a forensic report, is testimonial under the confrontation clause.
¶ 51. The majority opinion at ¶ 32 (emphasis added and internal citations omitted) asserts that it takes its formulation of the primary purpose test from Ohio v. Clark, 135 S. Ct. 2173 (2015), and states the test as follows:
[T]he dispositive "question is whether, in light of all the circumstances, viewed objectively, the "primary purpose" of the [out-of-court statement] was to creat[e] an out-of-court substitute for trial testimony."... The primary purpose test decides whether the declarant is acting as a witness against the defendant... by considering whether the primary purpose of the out-of-court statement "was to gather evidence for [the defendant's] prosecution."[4]
*155 ¶ 52. The majority opinion's approach presents two difficulties, however—difficulties the majority opinion masks.
• Although the majority opinion states that Clark "pronounces the controlling principles in determining whether an out-of-court statement is 'testimonial,1 " majority op., ¶ 32, the majority opinion's statement of Clark's primary purpose test is not fully faithful to Clark. The majority opinion, without explanation, cherry-picks what might be characterized as the narrowest formulation of Clark's primary purpose test and severely limits the definition of "testimonial" for purposes of the confrontation clause.
• Although all nine justices of the United States Supreme Court (as of the Court's last forays into defining "testimonial") agree that whether an out-of-court statement is testimonial depends (at least to an extent) on the primary purpose of the out-of-court statement, the United States Supreme Court justices have not uniformly or consistently formulated the primary purpose test. Different primary purpose tests are set forth by different justices in different contexts. Slight differences in the formulation of the primary purpose test can lead a court to a different conclusion regarding the testimonial nature of out-of-court statements.
*156 ¶ 53. The majority opinion is not fully faithful to Clark because it does not reveal or apply a primary purpose test that Clark derives from confrontation cases. Clark declares that "[statements] are testimonial when the circumstances objectively indicate . . . that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Clark, 135 S. Ct. at 2180 (quoting Davis v. Washington, 547 U.S. 813 (2006)). I refer to this formulation of the primary purpose test as the "potentially relevant" test.
f 54. The United States Supreme Court cases demonstrate that the justices are not necessarily in agreement about the formulation of the primary purpose test. I therefore examine the Court's confrontation cases to set forth the various formulations of the primary purpose test, including the "potentially relevant" test.
f 55. I begin with the Crawford case, the seminal confrontation clause case.[5]
¶ 56. Although Crawford did not conclusively define "testimonial," the Court did set forth three "formulations of [the] core class of testimonial' statements," which appear to have influenced later formulations of the primary purpose test:
[E]x parte in-court testimony or its functional equivalent—that is,... pretrial statements that de-clarants would reasonably expect to be used prosecuto-rially.
*157 Crawford, 541 U.S. at 51 (quoting Brief for Petitioner Michael Crawford).
[Ejxtrajudicial statements . .. contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.
Crawford, 541 U.S. at 51 (quoting White v. Illinois, 502 U.S. 346, 365 (Thomas, J., concurring in part & concurring in judgment).
[Statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.
Crawford, 541 U.S. at 52 (quoting Brief for Amicus Curiae National Association of Criminal Defense Lawyers).[6]
¶ 57. Then, in Davis v. Washington, 547 U.S. 813, 822 (2006),[7] Justice Scalia stated the primary purpose test as follows:
[Statements] are testimonial when the circumstances objectively indicate . . .that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.
Davis, 547 U.S. at 822.
*158 ¶ 58. In Michigan v. Bryant, 562 U.S. 344 (2011),[8] the primary purpose inquiry was described using Justice Scalia's "potentially relevant" formulation of the primary purpose test as follows:
[Statements] are testimonial when the circumstances objectively indicate that. . . the primary purpose ... is to establish or prove past events potentially relevant to later criminal prosecution.
Bryant, 562 U.S. at 356 (quoting Davis, 547 U.S. at 822). Justice Sotomayor, writing for the majority in Bryant, stated the test as follows:
When, as in Davis, the primary purpose of an interrogation is to respond to an "ongoing emergency," its purpose is not to create a record for trial and thus is not within the scope of the Clause. But there may be other circumstances, aside from ongoing emergencies, when a statement is not procured with a primary purpose of creating an out-of-court substitute for trial testimony.
Bryant, 562 U.S. at 358.
¶ 59. In Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009),[9] the Court considered the testimonial *159 nature of forensic reports for the first time since Crawford. Melendez-Diaz stated the primary purpose test as follows:
[Statements are testimonial when] "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."
Melendez-Diaz, 557 U.S. at 311 (quoting Crawford, 541 U.S. at 52).
¶ 60. In Bullcoming v. New Mexico, 564 U.S. 647 (20 11),[10] another case involving a forensic report, the primary purpose inquiry was described in "potentially relevant" terms as follows:
To rank as "testimonial," a statement must have a "primary purpose" of "establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution."
Bullcoming, 564 U.S. at 659 n.6 (quoting Davis, 547 U.S. at 822).[11] Concurring in Bullcoming, Justice So-tomayor stated the primary purpose test as follows:
*160 To determine if a statement is testimonial, we must decide whether it has "a primary purpose of creating an out-of-court substitute for trial testimony."
Bullcoming, 564 U.S. at 669 (Sotomayor, J., concurring) (quoting Bryant, 562 U.S. at 357).
¶ 61. In Williams v. Illinois, 132 S. Ct. 2221 (2012)[12], the Court's third case involving a forensic report, the primary purpose was described as follows:
In identifying the primary purpose of an out-of-court statement, we apply an objective test. We look for the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances.
[[Image here]]
*161 Here, the primary purpose of the . .. report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial.
Williams, 132 S. Ct. at 2243.
¶ 62. The dissent in Williams criticized this formulation of the primary purpose test as devoid of support in either the text or the history of the Sixth Amendment's confrontation right. Justice Kagan wrote that no case has ever suggested that the statement must be meant to accuse a previously identified individual. Williams, 132 S. Ct. at 2273 (Kagan, J., dissenting). Justice Kagan reiterated that the primary purpose test using the "potentially relevant" standard is proper as follows:
We have previously asked whether a statement was made for the primary purpose of establishing "past events potentially relevant to later criminal prosecution"—-in other words, for the purpose of providing evidence. ... None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual....
Williams, 132 S. Ct. at 2273-74 (Kagan, J., dissenting) (quoting Davis, 547 U.S. at 822; citing Bullcoming, 131 S. Ct. at 2716-17; Bryant, 131 S. Ct. at 1157, 1165; Melendez-Diaz, 557 U.S. at 310-11; Crawford, 541 U.S. at 51-52)
¶ 63. These several formulations of the primary purpose test are informative and illustrate that the U.S. Supreme Court has not adopted a single, definitive formulation of the primary purpose test.
¶ 64. The "potentially relevant" test, however, is the most prevalent in the Court's cases,[13] and is *162 helpful in the instant case: "To rank as 'testimonial,' a statement must have a 'primary purpose' of 'establish [ing] or proving] past events potentially relevant to later criminal prosecution." Bullcoming, 564 U.S. at 659, n.6 (quoting Davis, 547 U.S. at 822.
¶ 65. In applying the various formulations of the primary purpose test, I would look first and foremost to the three United States Supreme Court cases involving forensic reports: Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), Bullcoming v. New Mexico, 564 U.S. 647 (2011), and Williams v. Illinois, 132 S. Ct. 2221 (2012).
¶ 66. In the first two of these three cases, the United States Supreme Court concluded that the forensic reports were testimonial and did bear a resemblance to the historical practices that the confrontation clause aims to eliminate. The third case did not produce a majority opinion and has been subject to a variety of interpretations, but may hold no precedential value except in cases with identical facts. See majority op., ¶ 30 (explaining the limited precedential value of Williams v. Illinois).
¶ 67. Clark involves a traditional out-of-court declarant's statement, not a forensic report. Clark does not address these three prior Supreme Court cases involving the confrontation clause and forensic reports.[14] The majority opinion's application of the pri *163 mary purpose test fails to consider the guidance that these prior three cases dealing with forensic reports offer.
¶ 68. The "potentially relevant" test was used in Bullcoming, which involves a forensic report, as does the instant case. The forensic report in the instant case is similar to the forensic tests used to determine whether a substance is a controlled substance. See, e.g., Melendez-Diaz, 557 U.S. 305 (holding testimonial an analyst's report that substance was cocaine).
¶ 69. With little success, the majority opinion attempts to distinguish Melendez-Diaz and Bullcom-ing because the toxicology report in the instant case "lists the concentrations of the various substances present in S.L.'s biological samples sent for testing," so "the analyst who signed the report was not acting as a witness against Mattox . . . ." Majority op., ¶ 29.
¶ 70. This argument appears to be similar to the "mere scrivener" argument already rejected in Bull-coming. The Bullcoming court explicitly rejected the argument that forensic lab analysts' reports are non-testimonial because the analysts are "mere scriveners" who transcribe results from machines but do not interpret or exercise independent judgment. Bullcom-ing, 564 U.S. at 659.[15]
¶ 71. The "potentially relevant" test seems in keeping with the purpose of the confrontation *164 clause: "[T]he Clause's ultimate goal is to ensure reliability of evidence ... by testing in the crucible of cross-examination." Crawford, 541 U.S. at 61. And the "principal evil at which the Clause was directed. . . [was] use of ex parte examinations as evidence against the accused." Crawford, 541 U.S. at 50. In the instant case, the toxicology report is a form of ex parte examination insofar as the report was prepared outside of the circuit court or the defendant's presence. Because the State used the toxicology report as evidence against the defendant, he had the right to test the reliability of the report through cross-examination.
¶ 72. Furthermore, the "potentially relevant" formulation of primary purpose seems to fit the circumstances of the instant case. "None of [the Court's] cases has ever suggested that. . . the statement must be meant to accuse a previously identified individual . . . ." Williams, 132 S. Ct. at 2274 (Kagan, J., dissenting). Even though the toxicology report was not about Mattox, it could be (and was) used against Mattox.
¶ 73. The majority opinion does not explain why it ignores the "potentially relevant" formulation of the primary purpose test and how the "potentially relevant" formulation would apply in the instant case. Instead, the majority states and applies a primary purpose test that limits "testimonial" to those state *165 ments that create "an out-of-court substitute for trial testimony" in which the declarant "act[s] as a witness against the defendant." The majority opinion looks to whether the "primary purpose of the out-of-court statement was to gather evidence for the defendant's prosecution." Majority op., ¶ 32 (emphasis added).[16]
¶ 74. The question is whether this formulation of the primary purpose test comports with the bulk of the Court's confrontation cases. It does not.[17]
¶ 75. The majority opinion should refocus its inquiry to include as a primary purpose whether the toxicology report had a primary purpose of establishing "past events potentially relevant to later criminal prosecution." Davis, 547 U.S. at 822.
f 76. Applying the "potentially relevant" formulation in the instant case, as well as the other formulations of the primary purpose test, I conclude that the toxicology report's primary purpose was to establish *166 whether S.L. died of a heroin overdose, a fact that was "potentially relevant to later prosecution."
¶ 77. When the Waukesha Medical Examiner's Office requested a toxicology report conducted with samples taken from S.L., the report's primary purpose was to aid in determining the cause of S.L.'s death—a fact "potentially relevant" to a later prosecution. While external signs at the scene of the death, as well as those discovered during the autopsy, suggested an overdose, the toxicology report was needed to determine what type of drug caused the overdose. When the circumstances surrounding the report are considered, the "primary purpose" of the toxicology report was arguably to "establish or prove past events potentially relevant to later criminal prosecution." Clark, 135 S. Ct. at 2179-80 (emphasis added).
¶ 78. The report was "made for the purpose of establishing or proving some fact," Melendez-Diaz, 557 U.S. at 310-11, and that fact was "potentially relevant to later criminal prosecution." Clark, 135 S. Ct at 2180. That fact being, of course, that S.L.'s death was caused by an overdose of heroin—a fact that, at that time, Dr. Okia surely considered to be relevant to a later criminal prosecution.
¶ 79. Remember, S.L.'s death was the subject of a law enforcement investigation from the outset. When Dr. Okia's colleague, Deputy Medical Examiner Nichol Wayd,[18] arrived at the scene of S.L.'s death in the *167 predawn hours of February 2, 2013, after being called to the scene by law enforcement, she was briefed by law enforcement before investigating the death. Wayd also had to wait for a detective to arrive before touching anything at the scene of the death. At trial, the prosecutor asked about what Wayd does with death-related evidence when she investigates a death. Wayd responded:
It depends on the circumstances. In this circumstance, I was asked to wait for the detectives to arrive before I touched anything that could potentially need to be preserved, so in this situation, I did not touch any evidence in the room or even in the residence for that matter, so I stood by, waited for the detectives to arrive....
Once the detective arrived, the detective and the deputy medical examiner investigated S.L.'s room and the deputy medical examiner did a preliminary examination of the body before transporting it to the morgue. Even at this early stage, the detective's presence indicates that law enforcement were conducting a law enforcement investigation of S.L.'s death.
¶ 80. Dr. Okia performed an autopsy the next morning. Before conducting the autopsy of S.L.'s body, Dr. Okia would presumably have reviewed the deputy medical examiner's "Investigative Report" or another document to apprise herself of the situation surrounding S.L.'s death. She must have noted that S.L.'s death occurred under suspicious circumstances (he was, after all, an apparently healthy 27-year-old found dead), suggesting that the death may have been the result of a crime.
*168 ¶ 81. By her examination of the body (and review of the report's discussion of the evidence obtained in S.L.'s room, such as syringes), Dr. Okia must have suspected that S.L. died because of a drug overdose and that there might be a homicide charge against the deliverer of a controlled substance. Wis. Stat. § 940.02(2)(a). Therefore, when she ordered the toxicology report, her primary purpose was to determine whether an illegal drug caused an overdose.
f 82. Ultimately, Dr. Okia would use the toxicology report as a basis for her conclusion that S.L. died of a heroin overdose. Establishing that S.L. died from heroin was essential to the prosecution's charge against Mattox: homicide by distribution of a controlled substance. Dr. Okia testified that the signs of overdose discovered through her examination were consistent with the signs of an over-the-counter opiate overdose.
¶ 83. Surely, under these facts, the toxicology report was "prepared in connection with a criminal investigation or prosecution . . . [and] therefore within the compass of the Confrontation Clause." Bullcoming, 564 U.S. at 658-59.
f 84. It bears repeating that law enforcement and the Waukesha Medical Examiner's Office worked together from the beginning.
¶ 85. The close legal relationship between medical examiners, law enforcement, and district attorneys in Wisconsin also evidences a testimonial purpose.
¶ 86. In Wisconsin, medical examiners work in close conjunction with law enforcement pursuant to Wis. Stat. ch. 979 when investigating deaths and their duties overlap with those of law enforcement. By statute, police must immediately notify the medical examiner when a death occurs under a variety of *169 circumstances, including suspected homicides or other suspicious circumstances. Wis. Stat. § 979.0l(lg).[19]
¶ 87. Furthermore, the resulting toxicology report helped to prove a fact (cause of death) that was "potentially relevant" to a future prosecution, even if not yet commenced. Clark, 135 S. Ct. at 2179.
f 88. I turn from the majority opinion's analysis of primary purpose to additional factors set forth in Clark that demonstrate that the toxicology report is nontestimonial. See majority op., ¶¶ 32, 35-37.
¶ 89. In the instant case, the pertinent factors are the statement's context and formality, including *170 whether the statement was given to law enforcement. Because I have already discussed context as part of my application of the primary purpose test—which the majority seems to do, as well, majority op., ¶¶ 33, 35, 36—I consider the formality of the toxicology report.
¶ 90. Although the majority tries to downplay the formality of the toxicology report, see majority op., f 34, the toxicology report's formality is functionally equivalent to that of the forensic report in Bullcoming.
¶ 91. The toxicology "report" is a "signed docu-mentes] providing the results of forensic testing designed to " 'prove [e] some fact' in a criminal proceeding." Williams, 132 S. Ct. at 2266 (Kagan, J., dissenting) (discussing Bullcoming). And like the report in Bullcoming, the toxicology report's formal certification is limited to a signature by the analyst on a formal document entitled "St. Louis University Toxicology Laboratory Report." Although Waukesha County did not have to produce at trial "everyone who laid hands on the evidence," Melendez-Diaz, 129 S. Ct. at 2532, n.l, the defendant Mattox had a right to confront someone who helped produce the toxicology report or could give an independent opinion of the report.
f 92. The analyst's signature on this sort of document is an important indicium of formality because it certifies a constant chain of custody, integrity of the processes used by the St. Louis University Laboratory, and, overall, the accuracy of the report's contents— that is, the signature certifies the assertions contained in the report regarding levels of toxicity contained in S.L.'s blood and tissue samples. See Bullcoming, 564 U.S. at 661-62.
¶ 93. I conclude that the majority opinion erroneously classifies the report as non-testimonial. Dr. *171 Okia ordered the toxicology report in circumstances indicating that the autopsy she was conducting might be potentially relevant to a later criminal prosecution. Indeed, she ordered the toxicology report pursuant to the quasi-law enforcement role set forth for medical examiners in Wis. Stat. § 979.04(2).
¶ 94. Finally, like in Bullcoming and Melendez-Diaz, the problem with the toxicology report's admission was that it was used to prove a fact at trial, but no one was able to testify about the processes used at the testing facility.
¶ 95. The majority opinion's flawed application of the primary purpose test has not provided a "Crawford boundary," where courts may find a "logical stopping place between requiring the prosecution to call as a witness one of the laboratory experts who worked on the matter and requiring the prosecution to call all of the laboratory experts who did so." Williams, 132 S. Ct. at 2246, 2248 (Breyer, J., concurring).
f 96. Moreover, the majority opinion goes further than applying the primary purpose test and other factors to the facts of the instant case. It sets forth a general rule: Toxicology reports ordered in circumstances similar to those presented in the instant case are non-testimonial. Majority op., f ¶ 40, 42.
¶ 97. The majority opinion's general rule is unwarranted. The primary purpose test is necessarily fact-specific. The majority opinion should not attempt to issue a bright-line rule covering all cases under the auspices of a fact-driven test. Future cases will differ from the instant case in one aspect or another, but the majority opinion's bright-line rule may not respect these differences.
f 98. Finally, although this court has declared that "we believe a broad definition of testimonial is *172 required to guarantee that the right to confrontation is preserved," State v. Jensen, 2007 WI 26, ¶ 24, 299 Wis. 2d 267, 284, 727 N.W.2d 518, 527, the majority opinion provides, instead, a broad definition of "«ore-testimonial."
f 99. The demands of the Confrontation Clause were not satisfied in the instant case. No witness was available for cross-examination who could testify to the means by which the toxicology report was produced or could give his or her independent opinion of the data. See State v. Griep, 2015 WI 40, 361 Wis. 2d 657, 863 N.W.2d 567; State v. VanDyke, 2015 WI App 30, 361 Wis. 2d 738, 863 N.W.2d 919.
¶ 100. For these reasons, I respectfully dissent.
¶ 101. I am authorized to state that Justice ANN WALSH BRADLEY joins this dissenting opinion.

 Deadwiller, 350 Wis. 2d 138, ¶ 51 (Abrahamson, C.J., concurring).

 See Williams v. Illinois, 132 S. Ct. 2221 (2012) (plurality opinion) (No Sixth Amendment violation exists when "[a]n expert witness referred to the report not to prove the truth of the matter asserted in the report, i.e., that the report contained an accurate profile of the perpetrator's DNA, but only to establish that the report contained a DNA profile that matched the DNA profile deduced from petitioner's blood.").

 Ohio v. Clark, 135 S. Ct. 2173 (2015), involves a traditional out-of-court declarant's statement. It does not address forensic reports.
In Clark, the United States Supreme Court held that a child's statement to her teacher, which asserted that her mother's boyfriend was abusing her, was nontestimonial. The statement was nontestimonial because the child was too young to have the primary purpose to accuse the defendant and made the statements in the context of an ongoing emergency (his mother's boyfriend's abuse). Clark, 135 S. Ct. at 2184 (Scalia, J., concurring).
Justice Scalia, who wrote Crawford v. Washington, 541 U.S. 36 (2004), beginning a new era in confrontation law, concurred in Clark, declaring that the majority in the United *155 States Supreme Court is "shoveling fresh dirt upon the Sixth Amendment right of confrontation so recently rescued from the grave in Crawford v. Washington . . .." Clark, 135 S. Ct. at 2184 (2015) (Scalia, J., concurring).
The majority opinion also gleans from the Clark opinion the following factors relevant in the primary purpose analysis: "(1) The formality/informality of the situation producing the out-of-court statement; (2) whether the statement is given to law enforcement or a non-law enforcement individual; (3) the age of the declarant and (4) the context in which the statement was given." Majority op., ¶ 32 (footnote omitted).

 Crawford v. Washington, 541 U.S. 36 (2004), involved an assault and attempted murder case. At trial, the State introduced an incriminating recorded statement made by the defendant's wife (she did not testify because of marital privilege). The Court held that the State's use of the recorded statement violated the Confrontation Clause.

 See State v. Manuel, 2005 WI 75, ¶ 37, 281 Wis. 2d 554, 697 N.W.2d 811 (stating these three formulations).

 Davis v. Washington, 547 U.S. 813, 822 (2006), involved two cases consolidated on appeal. Each involved out-of-court statements made by domestic abuse victims and then used at trial. One case (Davis v. Washington) held nontestimonial a domestic abuse victim's statements made to a 911 operator during an altercation with her boyfriend. The second case (Hammon v. Indiana) held testimonial an affidavit written by a domestic abuse victim with the assistance of law enforcement.

 Michigan v. Bryant, 562 U.S. 344, involved a statement made to law enforcement by a shooting victim lying mortally wounded in a parking lot. The victim died shortly thereafter, but his statement was later used at trial; the petitioner was convicted of second-degree murder at trial. The Court held that the statement identifying, describing, and locating the shooter were not testimonial statements because they had a "primary purpose ... to enable police assistance to meet an ongoing emergency." Bryant, 562 U.S. at 349.

 In Melendez-Diaz v. Massachusetts, 557 U.S. 305, 310 (2009), the trial court admitted certificates of state crime laboratory analysis that concluded that the drugs seized were cocaine. The Court held that admission of these certificates without in-person testimony by the analyst violated the defendant's confrontation right.

 Bullcoming v. New Mexico, 564 U.S. 647 (2011), involved a forensic laboratory report certifying that the defendant had a blood-alcohol concentration that was above the legal limit. The analyst who prepared the report was on unpaid leave, so the State attempted to use the testimony of another analyst to validate the report. Over the petitioner's objection, the trial court admitted the report into evidence. The Court held that admitting this report violated the defendant's confrontation rights because the preparing analyst did not testify.

 The Bullcoming court explicitly rejected the argument that the report of the forensic lab analyst is nontestimonial because the analysts are "mere scriveners" who transcribe results from machines but do not interpret or exercise independent judgment. Bullcoming, 564 U.S. at 659. Instead, Justice Ginsburg explained:
*160 [The analyst] certified [in the report] that he received Bullcom-ing's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number "correspond[ed]," and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol. He further represented, by leaving the "[r]emarks" section of the report blank, that no "circumstance or condition.. . affect[ed] the integrity of the sample or . . . the validity of the analysis." These representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination.
Bullcoming, 564 U.S. at 660 (internal citations omitted).
The Court also noted that "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar." Bullcom-ing, 564 U.S. at 661 (2011).
Finally, the Bullcoming Court reiterated that the Sixth Amendment confrontation right could not be diminished for the sake of administrative or prosecutorial convenience.

 Williams v. Illinois, 132 S. Ct. 2221 (2012), involved a bench trial for rape. A forensic specialist testified that a sample of petitioner's blood matched a DNA profile collected through a vaginal swab and analyzed by an independent laboratory.

 See People v. Lopez, 286 P.3d 469, 490 (Cal. 2012) (Liu, J., dissenting) (the "potentially relevant" formulation of the primary purpose test is the "most faithful to the high court's *162 authoritative pronouncements in prior cases going back to Crawford,.").
For a discussion of hearsay, constitutional confrontation, and due process, see 2 McCormick on Evidence § 252 (Kenneth S. Broun ed., 7th ed. 2013 & Supp. 2016).

 The three United States Supreme Court forensic report cases, however, are lost along the way as Clark does not cite Bullcoming, Melendez-Diaz, or Williams and does not address forensic reports.

 Justice Ginsburg explained:
[The analyst] certified [in the report] that he received Bullcom-ing's blood sample intact with the seal unbroken, that he checked to make sure that the forensic report number and the sample number "correspond[ed]," and that he performed on Bullcoming's sample a particular test, adhering to a precise protocol. He further represented, by leaving the "[r]emarks" section of the report blank, that no "circumstance or condition .. . affect[ed] the integrity of the sample or . .. the validity of the analysis." These *164 representations, relating to past events and human actions not revealed in raw, machine-produced data, are meet for cross-examination.
Bullcoming, 564 U.S. at 660 (internal citations omitted).
The Court also noted that "the comparative reliability of an analyst's testimonial report drawn from machine-produced data does not overcome the Sixth Amendment bar." Bullcom-ing, 564 U.S. at 661.

 Although the majority says that Clark "pronounces the controlling principles in determining whether an out-of-court statement is 'testimonial,'" majority op., ¶ 32, the majority's restatement of the primarily purpose test is not fully faithful to Clark. Clark actually uses the language "the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution." Clark, 135 S. Ct. at 2180 (emphasis added).
Because Clark uses "potentially relevant," I do the same. The majority's language, "to create an out-of-court substitute for trial testimony," implies a higher Sixth Amendment bar.

 "None of our cases has ever suggested that, in addition, the statement must be meant to accuse a previously identified individual; indeed, in Melendez-Diaz, we rejected a related argument that laboratory 'analysts are not subject to confrontation because they are not "accusatory" witnesses.'" Williams, 132 S. Ct. at 2274 (Kagan, J., dissenting) (quoting Melendez-Diaz, 557 U.S. at 313.

 Nichol Wayd was a "deputy medical examiner/investigator for the Waukesha County Medical Examiner's Office." She testified at Mattox's trial. Part of her testimony involved her qualifications and her qualification as an expert "in the field of crime scene investigations" (emphasis added). Significantly, she has special training "in the area of crime scene investigations involving drug overdoses" and is a "diplómate" *167 of and member of "the American Board of Medicolegal Death Investigators." In addition to testifying at trial, Wayd prepared an "Investigative Report" that was admitted at trial.

 Medical examiners (or district attorneys) may order autopsies "in cases where an inquest might be had as provided in s. 979.04 . ..." Wis. Stat. § 979.02. Inquests may be ordered if
there is reason to believe from the circumstances surrounding the death that felony murder, first-degree or 2nd-degree intentional homicide, first-degree or 2nd-degree reckless homicide, homicide by negligent handling of dangerous weapon, explosives or fire, homicide by negligent operation of vehicle, homicide resulting from negligent control of a vicious animal or homicide by intoxicated user of a vehicle or firearm may have been committed, or that death may have been due to suicide or unexplained or suspicious circumstances....
Wis. Stat. § 979.04(2) (emphasis added).
See Olejnik v. England, 147 F. Supp. 3d 763 (W.D. Wis. 2015):
[A] medical examiner acts outside his jurisdiction when he orders or conducts an autopsy either without having made a subjective determination that there is any reason to believe that any of the statutory circumstances justifying an autopsy exists or having made a subjective determination that there is no reason to believe that any of the statutory circumstances justifying an autopsy exists.
Olejnik, 147 F. Supp. 3d at 775 (quoting Scarpaci v. Milwaukee Cty., 96 Wis. 2d 663, 292 N.W.2d 816 (1980)).